```
 1   TRANSCRIBED FROM DIGITAL RECORDING

 2              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 3                       EASTERN DIVISION

 4   COMPLEMENTSOFT, LLC,              ) Docket No. 12 C 7372
                                       )
 5          Plaintiff,                 )
                                       ) Chicago, Illinois
 6              vs.                     ) March 7, 2014
                                       ) 10:31:56 o'clock a.m.
 7   SAS INSTITUTE, INC.,              )
                                       )
 8          Defendant.                 )

 9              TRANSCRIPT OF PROCEEDINGS - Status
            BEFORE MAGISTRATE JUDGE JEFFREY T. GILBERT
10
     APPEARANCES:
11   For the Plaintiff:        SCHIFF HARDIN LLP
                               BY:  MR. JAMES EDWARD HANFT
12                             666 Fifth Avenue
                               New York, New York  10103
13
                               SCHIFF HARDIN LLP
14                             BY:  MR. GEORGE CHIH-LUN YU
                               One Market, Spear Street Tower
15                             Suite 3200
                               San Francisco, California  94105
16                             (via telephone)

17   For the Defendant:        JONES DAY
                               BY:  MR. JOHN A. MARLOTT
18                             77 West Wacker Drive
                               Suite 3500
19                             Chicago, Illinois  60601

20              Laura LaCien, CSR, RMR, FCRR, CRR
                       Official Court Reporter
21              219 South Dearborn Street, Suite 1902
                       Chicago, Illinois  60604
22                       (312) 408-5032

23

24       **PLEASE NOTIFY OF CORRECT SPEAKER IDENTIFICATION**
     NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES PORTIONS
25   UNINTELLIGIBLE AND INAUDIBLE.
```

 1    (The following digitally recorded proceedings were had in
 2  open court:)
 3        COURTROOM DEPUTY:  12 CV 7372, ComplementSoft LLC
 4  versus SAS Institute, Incorporated.
 5        THE COURT:  Okay.  I know we got people on the phone
 6  or maybe one person on the phone.  People here, you want
 7  to -- in the courtroom want to state your appearances and --
 8        MR. MARLOTT:  John Marlott for Sass Institute, your
 9  Honor.
10        MR. HANFT:  James Hanft for ComplementSoft; and on
11  the phone is George Yu.
12        MR. YU:  Good morning, your Honor.
13        THE COURT:  Okay.  Well, welcome to our city here,
14  Mr. Hanft.  I tried to -- I mean, thanks for bringing our
15  spring weather, I guess, if that's -- if that's what you did.
16        MR. HANFT:  I wish I could take credit.
17        THE COURT:  Well, somebody should take credit.  I
18  mean, it hasn't happened, so.  But it was cold by you, too.
19  Right?
20        MR. HANFT:  Yeah.
21        THE COURT:  We're having -- Mr. Yu, you don't know,
22  but we're having, you know, just marvelously beautiful
23  weather today.  It's above freezing.
24        UNIDENTIFIED MALE SPEAKER:  Barely.
25        THE COURT:  All right.  Well, I thought maybe -- I

1   mean, I've read everything.  All right.  I mean, if you guys

2   want to have a seat, you could have a seat.  Is that okay?  I

3   mean --

4           UNIDENTIFIED MALE SPEAKER:  Yeah.  Sure.

5           THE COURT:  I assume you're sitting Mr. Yu, right?

6           MR. YU:  Yes, your Honor.

7           THE COURT:  Good.  I mean, I've read everything.

8   Why don't I tell you where I am, all right, and my decision

9   is not to lift the stay.  But, Mr. Hanft, I'll give you an

10  opportunity to explain to me why you think I'm -- you know.

11          MR. HANFT:  I would appreciate that, your Honor.

12          THE COURT:  Why you think I'm wrong but can I give

13  you my reasons first?  That's why I said you could --

14          MR. HANFT:  Sure.

15          THE COURT:  And you can stand if you want to.

16          I -- You know, I read everything.  I re-read the

17  transcript from the last time to refresh myself as to where

18  we were.  I read some of the cases.  I still think that the

19  reasons that lead me to grant the stay in the first place

20  continue to exist and support continuing the stay until the

21  conclusion of the inter partes review process.

22          You know, if anything, I think frankly that there

23  are more reasons to continue the stay today at least based on

24  what I'm reading in the briefs than there were ten months ago

25  in May of 2013.  I recognize it's taking a long time.  I

1  recognize that ComplementSoft is anxious to get this show

2  more on the road here if there's going to be a show here and

3  so I recognize that.

4          I think your argument basically boils down to the

5  fact that you're anxious to push forward with discovery and

6  potentially whatever happens with the IPR process, IRP

7  process, there's going to be something to discover and argue

8  about here, right?

9          UNIDENTIFIED MALE SPEAKER:  Yes, but --

10         THE COURT:  In part, okay.

11         UNIDENTIFIED MALE SPEAKER:  -- in part.

12         THE COURT:  Okay.  And I get that but I also think

13  that there are other important considerations, okay.  The

14  patent is under review.  It has been accepted for review.

15  There's going to be a decision on this one way or another

16  that affects the validity of the patent.  There's a

17  contingent motion to amend the patent if you -- if

18  ComplementSoft loses some of this which could raise new

19  substitute claims.  I think the defendant says nine

20  substitute claims.  The parties predict at least that we're

21  going to know a lot more about the situation in six months.

22  I know that that's a long time.  It's a blink of the eye

23  sometimes in federal practice.

24         I think finishing the IRP process is going to

25  provide us with valuable information.  We're going to know --

1  at least we're going to know more than we know now.  I think

2  more information is good usually.  It is possible or even

3  likely that the conclusion of that process in my view is

4  going to provide the parties information to evaluate the

5  merits of the case, potentially settlement possibilities, the

6  scope of the issues that need to be litigated and even define

7  what those issues are a little bit more than we have them

8  today.

9        If I allow discovery to go forward, I foresee at

10  least the possibility of some confusion and uncertainty.  I

11  think what will happen as a practical matter -- and I'm a

12  fairly practical person -- is that people will start to move

13  forward with some discovery, somebody is going to object,

14  there's going to be a motion, the other party is going to

15  want to respond to that motion.  Sure as shootin', even

16  though I don't like replies, often the other party is going

17  to say I want to reply.  The issues might be complicated

18  enough that I want a reply.  That's going to eat time off of

19  the clock.

20        Then we're going to get to the point of me making a

21  decision on whatever dispute you have.  And somebody --

22  probably SAS -- is going to say, Judge, we're going to know

23  in two months or we're going to know in six weeks or we're

24  going to get an opinion in a month or something like that.

25  Even if that doesn't happen, we're going to argue a lot about

 1  what's relevant, what's not relevant, what's going to happen,

 2  what will be relevant if the IRP process goes this way or

 3  that way.  I think that's a waste of time and money.  Most

 4  importantly, time but also money.  So I -- if I were in your

 5  place as a lawyer, if I were in your client's place as the

 6  plaintiff in this case, I would say -- be saying essentially

 7  what I hear you saying, enough is enough, you know, the -- we

 8  should go forward, this is what you told me the last time

 9  too.  You know, we've responded to discovery.  They haven't.

10  There are certain things that are going to be relevant in any

11  event.  I'm not a hundred percent sure of that but assuming

12  it is, I don't think your client is so terribly prejudiced by

13  not being able to go forward.  And for the reasons that I've

14  just articulated, I think that there are some reasons why we

15  would all be better off waiting a little bit more time and

16  understanding exactly what is going to be litigated.  That

17  may be simplistic but that's where I was coming out after I

18  read your briefs and thought about this a little bit more and

19  understood what the case law was and looked at the factors so

20  I'll stop.

21      You obviously disagree with me and I'm happy to

22  listen to you but that's kind of where I am and I'm not -- I

23  wasn't really wishy-washy on that.  I was -- you know, I kind

24  of thought about it because while I'm not as expert at

25  patents as you are, I know that -- I want to -- I guess I

1  wanted to satisfy myself that this wasn't a useless exercise

2  of waiting and I don't think it is.

3         MR. HANFT:  I'd like to address these because I

4  think there's some misconceptions that are raised by the

5  opposition brief that SAS filed here.

6         THE COURT:  Okay.

7         MR. HANFT:  First, just to start off, we actually

8  agreed -- SAS -- ComplementSoft actually agreed to this

9  motion and we have disputes about discovery and stuff like

10  that and which should go forward and not.  But in the

11  beginning, we agreed to it and the reason was is because it

12  made sense at the time.  It doesn't now.

13         THE COURT:  Wait.  Hold on.  Let me -- I'm going to

14  interrupt you.  I'm going to exercise the power of the chair

15  for a second.

16         MR. HANFT:  Sure.

17         THE COURT:  Okay.  Because when I read the

18  transcript, it refreshed me about how you agreed to it, okay,

19  and I addressed it in the transcript which is Exhibit E to

20  SAS's opposition and I kind of called you on it at that time.

21         MR. HANFT:  Yes.

22         THE COURT:  I thought that that argument was a

23  little bit too cute by half.  You know, ComplementSoft did

24  say we're okay with a stay provided that we can go forward

25  with some limited discovery here and do this and we have

1   responded -- you know, we came forth, we responded quickly to

2   their document request, we produced stuff, we answered

3   interrogatories.  They haven't done it.  There are certain

4   things that we want to do.

5            So when you come in and say ComplementSoft agreed to

6   this stay at the beginning, in all fairness, you didn't agree

7   to it a hundred percent.  You didn't agree to a stay a

8   hundred percent stop.  What you agreed is well, okay, it was

9   something that you might call a stay as long as SAS has to

10  respond to our discovery, produce documents, answer some

11  interrogatories, move forward on this stuff and --

12           MR. HANFT:  I don't disagree with your Honor.  Yes,

13  it was.  We said -- and part of the reason for that was

14  because some of that discovery was relevant to the IPR.  The

15  court said no.  If you want it, you can go to the board in

16  getting the IPR and that's fine.

17           But in that agreement -- in that analysis is kind of

18  what I'm getting at, they were -- you know, we looked at

19  those three factors and at the time it made sense.  It

20  doesn't now.

21           The two factors which are completely different now

22  is that a stay will simplify the issues in question and

23  streamline the trial and that it will reduce the burden of

24  litigation on the parties and on the court.  So those two

25  factors don't exist anymore.  And we are -- what we're doing

1   here is we want those things to go forward that have to be

2   done regardless.  And then when the IPR concludes, we would

3   then do the claim construction process.  So we thought a lot

4   about this and we knew, well, if we tried to, you know, just

5   open it wholly and move forward exactly pursuant to the local

6   rules, you know, we get objections because claim construction

7   and there is some validity to the argument that claim

8   construction should be done after the IPR is concluded

9   because there might be something that happens in it so we

10  don't disagree with that.  Claim construction should occur

11  after the IPR concludes but there is a whole set of things

12  that we can do now that are not contingent on the IPR.

13          Now I read every word of their brief and I tried to

14  figure out, okay, what is it that they're specifically saying

15  that they will not have to produce in this case or what

16  discovery is going to -- what specific discovery is going to

17  occur that would end up being wasteful.  The only thing I saw

18  in their brief was these conclusory allegations that claims

19  are in flux and that some of the claims may not be at issue.

20          First, Claim Two is -- depends from Claim One, it's

21  going to be in this case because it's not part of the IPR.

22  Claim One is going to remain exactly as it is.  It's never

23  going to change.

24          THE COURT:  Well, time-out.  Isn't it possible -- I

25  keep saying IRP.  It's really IPR, inter partes.  Isn't it --

1    what discovery will be necessary here if the result of the

2    IPR process is that your patent is invalid?

3              MR. HANFT:  Invalidated?  If the claims that are at

4    issue are invalidated, we will need to do discovery on the

5    products at issue which are the same products regardless

6    of -- whatever claim comes out, it's the same products that

7    are at issue.  They are a functional complete unit and

8    everything that surrounds them relates to that functional

9    unit.  It's not like two separate discovery for some small

10   aspect of it with respect to some small minor limitation.

11   That's not the case here.  It is a product.  In this case,

12   we're asserting against the enterprise guide which is -- it's

13   a software program.

14             Coming back to what the -- their allegation was,

15   well, these claims are all going to change and they're in

16   flux and there are some -- bless you --

17             THE COURT:  Thank you.

18             MR. HANFT:  --  there are some motions to amend on

19   all these things.  Well, regardless of the outcome of any of

20   those, the discovery with respect to that particular issue of

21   infringement isn't going to change because it's that product.

22   Now in patent cases, typically there's -- the issues that

23   I've seen in this case by going through all the pleadings are

24   validity, infringement, damages, willfulness, laches and

25   estoppel, notice and marking.  I might have missed something

1  but those are mostly the general categories.  Let's deal with

2  them one at a time.

3      Validity.  If the claims are invalidated, they're

4  not part of this case.  If the claims are affirmed or

5  affirmed as amended, then they're estopped from challenging

6  it so validity is not part of this case so validity is really

7  not going to change with respect to what happens in the IPR.

8      THE COURT:  Look, can we stop on your first point

9  for a second because I don't know that I understand it

10 completely?

11     MR. HANFT:  Uh-huh.

12     THE COURT:  If the IPR process results in an -- and

13 I'm not presaging this.

14     MR. HANFT.  Okay.

15     THE COURT:  I'm just saying there's a bunch of

16 different outcomes.  But one outcome is that Claim One and

17 any of these other, you know, things out there, but there's a

18 finding of invalidity, you're telling me that's not going to

19 change this case one iota.  It's not going to change the

20 discovery on the case.  It's not going to change the parties'

21 positions with respect to whether the case can be resolved.

22 It's not going to change anything.  It's a -- it's a tree

23 falling in the forest.  Nobody hears it.  It didn't make a

24 sound and we're just going to pick up where we left off.  I

25 find that hard to believe and I find that if I ask defendant

1  that to respond to that, just that point, and -- and this is

2  just a -- and I will.  I am.  I'm going to exercise the power

3  of the chair and interrupt here because this is a microcosm

4  of what I'm trying to avoid which is let's say we go forward

5  with discovery and you have a firm view as to what discovery

6  will be relevant, A, if the patent is invalidated.  B, if

7  it's not.  C, if Claim Three survives.  You know, and this is

8  why we want SAS to respond to this discovery, your Honor.

9  And SAS comes in and says well, no, no, no, no, no because if

10  the IPR process results in X, then this thing is not going to

11  be relevant.  This might be a little bit but the scope of it

12  might not be the same and then I'm trying to argue about how

13  many angels dance on the head of a pin here when I can in

14  some short relatively period of time, okay, I will know, all

15  right, and then I don't have to decide whether what the IPR

16  process is going to do or not.  I will know.  You will know

17  and then I don't have to get involved in a whole bunch of

18  argument of what if's and all the rest.  There is no what if.

19  It is.

20         And so -- I'm going to stop for one second because

21  that's at least what I'm understanding from SAS.  I'd like

22  SAS to have, you know, two minutes to tell me why either I'm

23  wrong or -- because this gets to the heart of it.  I mean, I

24  understand that there's --

25         UNIDENTIFIED MALE SPEAKER:  Yeah.  I want to give

1    you the answer to this because --

2         THE COURT:  Okay.  And I recognize also that we

3    didn't get into the weeds here with respect to document

4    request number five is going to be relevant in any event,

5    seven may not be, interrogatory two may be.  I mean, I

6    understand we didn't get there.  We're at a very conceptual

7    level.  And if I think it makes sense to get into the weeds,

8    I will; but at the broad conceptual level, I thought we could

9    wait.

10        So let me get two minutes from you as to where

11   you're coming from on this.  Do you agree that no matter what

12   happens, we know now what you're going to have to produce and

13   all the rest?

14        MR. MARLOTT:  Not at all, your Honor, and that's

15   what we explained in our brief.  In a patent infringement

16   case, the name of the game is the claim, right, but the

17   patent claim drives all this stuff to the issues in the case,

18   what patent claims are being asserted.  That tells us for

19   infringement purposes.  What do we have to compare between

20   the asserted claims and the accused products.  There are

21   validity issues.  What do we have to -- which claims do we

22   have to compare to the prior art to determine whether or not

23   there's validity.  Damages.  Which claims are asserted, which

24   products are alleged to infringe, what are the damages, okay.

25        Mr. Hanft is suggesting that we can go forward now

1   on some apparently subset of the claims, some of these

2   dependent claims that I think at least are going to survive

3   the IPR without regard for what the Patent Office is doing

4   with respect to the other claims, including the only

5   independent claim in the entire patent, all right.

6   So all these claims that he's talking about that are

7   going to survive, that we should go ahead now and do

8   discovery on, they all depend from the only independent claim

9   in the patent. They include all the limitations of that

10  independent claim, all right, that the Patent Office is

11  currently reviewing. All right.

12  I think your instincts are correct here, your Honor,

13  that let's wait five more months now. We're only about five

14  months from when the parties agree that we're going to get a

15  decision from the Patent Office on that independent claim,

16  the meaning of and the scope of that independent claim,

17  whether or not that independent claim is valid or not, all

18  right. It's going to have an impact on all the dependent

19  claims, the meaning of the language and all those dependent

20  claims, whether or not there's infringement, whether or not

21  there's validity of those claims, what the damages would be

22  on those claims and we'll also know in five months whether

23  these substitute claims, the amended claims that they propose

24  to put into the patent actually exist, all right. Is the

25  Patent Office going to allow those claims and are we going to

1  have to take discovery on those claims.

2        What he's suggesting is let's do some bits and

3  pieces of discovery now on these narrower claims when there's

4  a possibility if they succeed in the IPR, we're going to be

5  back here in five or six months doing broader discovery, all

6  right, then why did we spend this five months doing this

7  narrow piece when we're going to have to probably duplicate

8  it again doing broader discovery later.

9        THE COURT:  Well, I think what he's saying is

10  there's some -- and I don't know that you're necessarily

11  disagreeing with this but the devil is in the details, okay.

12  There's some discovery that if the case proceeds and if it

13  doesn't get resolved -- I mean, in other words, at least

14  there is, you know -- in our courthouse here, patent cases,

15  civil rights cases, contract cases, diversity cases, ERISA

16  benefits cases and everything else in between and more, 98.8

17  percent of our cases don't go to trial, okay.  I don't know

18  what it's like in the Southern District of New York or

19  Eastern District or whatever but about 1.2 or 1.3 percent of

20  our cases go to trial.  The vast majority of the ones that

21  don't go to trial taking out the ones where people just give

22  up and fall or go bankrupt or just -- they settle, they get

23  resolved, okay.

24        Now I don't know whether this case is going to be a

25  part of the 1.2 or the 98.8.  It seems to me that it is at

1   least possible from reading all these cases I've read that

2   one of the benefits of the IPR process is to frame some

3   issues that the parties can then say are we going forward

4   with our litigation or not.  Maybe that won't happen here;

5   maybe it will.

6           But the -- I think you're still talking in

7   generality because I think what he would say is, there's some

8   stuff that has -- that will go -- if we're going to go

9   forward with the litigation, we're in the 98.8 percent or at

10  least we're still in the 98 -- I mean, we're in the 1.2

11  percent and at least we're in that for at least a little

12  while until we see what it looks like.  Some of that stuff is

13  going to have to go forward regardless and I don't think

14  you're disagreeing but there's a scope issue and there could

15  potentially be relevance issues too.  Is that what you're

16  saying?

17          MR. MARLOTT:  That's exactly what I'm saying.

18          MR. HANFT:  Your Honor, I think there's a -- they're

19  talking generalities because if they actually got down to the

20  merits, they'd realize that there is nothing that they're

21  going to be able to exclude from discovery based upon

22  whatever claims come out and that is because the scope of the

23  claims that are coming out are almost co-extensive with the

24  ones that are in there.

25          He's talking about these, well, there are some

1   dependent claims and there's some amendments. You know what,

2   the accused product here, you're going to have to produce it

3   regardless. And with those dependent claims, it's -- you

4   know, there are dependent claims that are currently in the

5   Patent Office and there's a misconception here with respect

6   to infringement. If you -- to infringe Claim Two which is

7   not in the IPR, you have to prove every limitation of Claim

8   One and every limitation of Claim Two. So whether Claim One

9   survives or not as it is or if it's changed doesn't make a

10  difference with respect to the outcome of discovery in this

11  case.

12          These dependent claims, these limitations within

13  them, they are encompassed within whatever they're going to

14  produce with respect to Claim One, with whatever they're

15  going to produce with respect to Claim Two. So no matter

16  what claims come out of this case, the scope of the discovery

17  is going to be the same. And I'm not saying take limited

18  discovery. I'm saying discovery should be open with respect

19  to this case because there's no reason not to open it. And

20  I'd like to know from them if claim survives -- if claims

21  don't survive, what discovery does not need to be taken.

22  What is it that's going to be wasteful -- specifically, not

23  generally -- because I hear, well, claims change and they're

24  in flux and all this stuff.

25          You know what, I like specifics because then I could

1    say okay, that makes sense.  There is this block of 20

2    percent of discovery that's going to be out of this case that

3    they don't need to do.  If that's the case, I'll withdraw the

4    motion.  But if it comes down to this one percent because I

5    might have to ask during a deposition well, your products do

6    this, don't they, which I know they're going to admit because

7    in their contentions for those claims that are still in the

8    IPR, you know, Local Rule 2.3, you have to put in preliminary

9    non-infringement contentions, they didn't say they don't

10   infringe these claims that are still in the IPR except for

11   Claim One which, because of the situation of Claim Two

12   depending from Claim One, we have to prove infringement on

13   all of that anyway.  So I'd like specifics if your Honor

14   would be willing to --

15            THE COURT:  Well, look, I mean, what I'm hearing --

16   you made a tactical decision to say we want to lift the stay

17   entirely now, okay, and that's really what you want --

18            MR. HANFT:  Yes.

19            THE COURT:  -- lift the stay entirely.  There's

20   really no basis for the stay continuing, okay.  Really, in

21   May of 2013 when I imposed the same argument in May of

22   2013 -- though you didn't necessarily make it -- then you

23   were coming in and saying we're okay with the stay provided

24   that we can still do discovery which kind of undercut the

25   purpose of the stay.

1        Now you're saying the stay is no longer appropriate,

2   never was appropriate --

3        MR. HANFT:  No.  That -- I'm not saying that.

4        THE COURT:  Okay.

5        MR. HANFT:  What I'm saying is because we have Claim

6   Two and 10 through 16, that that rationale that applied back

7   then no longer applies now because we have to do this -- all

8   this discovery is going to have to be done absent settlement.

9        Now the only thing that you said before which I want

10  to address is, you know, whether it would affect, you know,

11  settlement of this case.  That's an answer I can't give on

12  behalf of ComplementSoft.  I don't know whether the outcome

13  of the IPR is going to make any change in their position.

14  Other than that, I don't think that there's anything that's

15  going to change in this case with regard to discovery

16  occurring happening prior.

17       And by the way, all of those cases that were cited

18  in their brief, the rationale behind all of them -- all of

19  those was with respect to claim construction.  So when you

20  have an independent claim at issue in an IPR and you have

21  dependent claims, you could have something that happens to

22  the claim construction with that that would affect those

23  dependent claims.  That's the reason why we're saying, you

24  know what, let's do claim construction after the IPR because

25  that made sense.  And it actually dovetails with the local

1   rules which say do all of the discovery, then do claim

2   construction briefing.

3           THE COURT:  Okay.  So let me just -- what you're

4   saying is we should be able to go forward and do discovery on

5   things that are not really part of the IPR process Claim Two

6   and Claims 10 through 16, right?

7           MR. HANFT:  Yes.

8           THE COURT:  And that we will have to do that

9   discovery no matter what, right?

10          MR. HANFT:  Yes.

11          THE COURT:  And that is -- is it your position that

12  there is some discovery that would be relevant in this case

13  depending upon what happens in the IPR process on Claim One

14  and Claims Three through whatever that we're not going to do

15  now or is all of this discovery on claim -- that you would be

16  doing on, quote/unquote, on Claim Two and 10 through 16 all

17  the discovery that would be necessary?

18          I don't know if I'm making myself clear.  But what

19  I'm feeling is that let's say your position carries the day,

20  we go through some discovery here and we get a ruling as a

21  result of the IPR process, okay, there's more discovery that

22  would have to be done, additional discovery, potentially

23  broader discovery, potentially discovery on different things

24  that will also now have to happen before we get to the claim

25  construction process.

1    And so my question is, why not do all of it at one
2  time rather than do some of it now and some of it later?
3    MR. HANFT:  My position is that all the discovery is
4  going to be done now and we're not going to be coming back
5  and say, oh, we need additional discovery with respect to
6  claims -- the claims that were in the IPR because now they're
7  an issue.
8    The reason being is that these -- they're producing
9  with respect to these products.  They shouldn't be -- I don't
10 know how you can carve out the functionality of these
11 products because it's like okay, they operate in a certain
12 way.  You have to produce -- you know, there's going to be
13 marketing materials.  There's going to be design documents
14 and things like that.  They're all going to be relevant
15 whether it's Claim One at issue or Claim Two at issue or
16 Claim 10 at issue.  All those documents are going to be
17 relevant to this.
18   And I guess my question is, if there is this subset
19 of documents that they're going to withhold because -- and
20 don't meet the standards of relevant to any claim or defense,
21 you know, that could change this calculus.  But unless
22 there's like a block or documents or some reason, my position
23 is that the discovery we're seeking is going to be the same
24 and we're not coming back into this court and asking for it.
25 But the only way I could see that happening is if the

1    tactical decision is made to, well, we're not going to

2    produce this because we don't think it's relevant to

3    such-and-such dependent claim but I don't see how that can

4    literally and legitimately be done in a case when we're only

5    talking about one product.

6         If these claims were -- if we had claims too that

7    might cover a different product or a completely different

8    aspect of the same product where the documentation set would

9    be different, where the witnesses would be different, I can

10   understand it.  I don't think that's this case.

11        THE COURT:  Okay.  Two things.  One, for purposes of

12   the record, that's Mr. Hanft who has been talking.  He's been

13   talking most of the time here in case anybody orders this

14   transcript and it gets written.  And the other counsel is

15   Mr. Marlott and he spoke just a little bit at the beginning.

16        Give me your impression -- and before you give me

17   the impression, this is a weird argument to have because

18   normally when I'm trying to determine what kind of discovery

19   goes forward or not, I'm looking at the discovery, okay.  I'm

20   looking at document request number three that asks for this,

21   interrogatory number five that asks for this so we're not

22   doing that.  We're having a very conceptual discussion here.

23   So -- but my inquiry here is whether or not I think --

24   whether it would make sense to have a more specific

25   discussion.

1          So what's your response to what Mr. Hanft is saying?

2          MR. MARLOTT:  Well, one thing, your Honor.  He's

3    only talking about one issue in the case, infringement.  He

4    keeps talking about documents that SAS will have to produce

5    and discovery that he wants from us.  Okay.

6          There's another complicating factor here and that

7    validity issues are going to remain in the case, right.  If

8    the IPR ends in five months from now, it's August when we're

9    outside that decision from the IPR and the parties aren't

10   able to resolve which is a factor here, your Honor, right,

11   that in five months, the parties are going to have a decision

12   from the Patent Office and they may sit down and be able to

13   resolve this thing making any intervening discovery here

14   wasteful.  But putting that aside, assume, you know, we get a

15   decision in the IPR, it's conceivable that claims are going

16   to come out of that IPR and we, SAS, are going to need to do

17   discovery on validity, right, validity issues on those claims

18   that come out of the IPR.  And we'll be estopped on some

19   issues, right, you know, prior art publications and patents,

20   right, we'll be estopped.  But there could be validity issues

21   on claims that come out of the IPR that we'll have to do

22   discovery on, right, which is discovery that we would not be

23   taking now because we don't know what the claims are going to

24   be.  These claims are still moving targets, all right, but

25   we'll know in five months what the claims look like, what is

1    the claims picture.  We'll know that in five months.

2          And again, it comes back to your point, your Honor,

3    why do it in bits and pieces now.  Why don't we wait a few

4    more months, see what the actual picture is and do it all at

5    one time.

6          THE COURT:  Well, I get a feel here.  Number one,

7    ComplementSoft is still ticked off -- I think, Mr. Hanft --

8    that they produced a whole bunch of stuff and you didn't,

9    okay.  You know, discovery started in a sense, requests were

10   exchanged, and ComplementSoft made a decision at that time to

11   push forward in responding to your discovery in part to head

12   off potentially a motion to stay during an IPR process.  That

13   was a tactical decision ComplementSoft made.  They didn't

14   have to do that.  They could have waited, whatever, I think.

15   But I --

16         UNIDENTIFIED MALE SPEAKER:  We asked them to.

17         THE COURT:  Pardon?

18         UNIDENTIFIED MALE SPEAKER:  And we asked them to.

19         UNIDENTIFIED MALE SPEAKER:  No.  You didn't.

20         UNIDENTIFIED MALE SPEAKER:  We did.  We asked -- we

21   said both parties, we should hold off on this discovery.

22         UNIDENTIFIED MALE SPEAKER:  No.  You didn't.

23         THE COURT:  I think there was some --

24         UNIDENTIFIED MALE SPEAKER:  It's in the record.

25         THE COURT:  Yeah.  I think it is in the record.  I

1   mean, there was a dispute about this the first time around

2   but I think there was some correspondence that you guys were

3   pushing to get this thing moving and I think they were saying

4   to you something to the effect of we're going to be moving a

5   stay here and we don't need to be pushing hard to do this,

6   right?  I mean, I don't recall it exactly but it was in the

7   prior briefing and it was referenced in our discussion.

8          So I -- I get it, I get it that there was -- there

9   is a disequilibrium here in the sense that you've produced a

10  whole bunch of stuff and they haven't produced anything.  I

11  also get --

12         UNIDENTIFIED MALE SPEAKER:  That's not correct, your

13  Honor.  We did produce --

14         THE COURT:  You've produced some stuff.

15         UNIDENTIFIED MALE SPEAKER:  -- the documents -- in

16  accordance with the local rules, 75,000 pages of technical

17  documents.

18         THE COURT:  I know.  But no e-mails and --

19         UNIDENTIFIED MALE SPEAKER:  All right.  But -- Yeah,

20  That's correct.

21         THE COURT:  -- no stuff that gets under the hood and

22  none of the manuals and all the rest of this stuff --

23         UNIDENTIFIED MALE SPEAKER:  Well, that's not --

24         THE COURT:  -- or some of the manuals, maybe.

25         UNIDENTIFIED MALE SPEAKER:  Yeah.

1        THE COURT:  Okay.  But -- so point number one, as I

2   understand, your client is still a bit ticked about that and

3   go -- and your discussions with your client probably are, you

4   know, Hanft, what the heck is going on here, we're waiting

5   for the IPR process, we've already produced our stuff, why

6   haven't they produced their stuff.  Number one.  You don't

7   have to even comment on that.

8        But number two, it seems to me based on this

9   exchange here that they're probably -- if the case is not

10  going to get resolved or narrowed as a result of what happens

11  in the IPR process, Mr. Marlott didn't say there's nothing,

12  you know, that we couldn't do now that would also have to be

13  done then regardless.  I mean, there probably is.  There

14  probably are productions that could be made now.  There

15  probably are -- is information that could be exchanged now

16  and if the case is here in the same shape later could be done

17  here.

18        There are probably, however, things that we don't

19  even know necessarily.  People may want to modify their

20  discovery based upon what happens in the IPR process.  There

21  might be issues that could arise.  All of this is now

22  theoretical, okay.

23        And so the question is in terms of judicial economy,

24  convenience, expense, cost, should we move forward now ten

25  months into the process that we started on or wait to see how

1    that process ends?  Okay.

2         I'm not moved at all by the fact that ComplementSoft

3    produced a whole bunch of stuff in response to the discovery

4    that SAS served and SAS didn't produce as much as

5    ComplementSoft wanted or, B, didn't -- that we didn't allow

6    at least before we did that IPR process more information to

7    be exchanged without the stay hitting the way you had argued

8    the first time.  I just -- that's a tit-for-tat kind of

9    thing.

10             UNIDENTIFIED MALE SPEAKER:  Your Honor --

11             THE COURT:  Uh-huh?

12             UNIDENTIFIED MALE SPEAKER:  -- that is not our

13   rationale here.  The rationale is this was filed in September

14   of 2012, 18 months into this case.  The average case in this

15   jurisdiction is 31 months.  Now absolutely -- there's no

16   reason not to go forward with the discovery -- with discovery

17   at this point because it has to be done regardless and, okay,

18   wait another five months.  How long do we have to keep

19   waiting?

20             And then what -- kind of what irked me in their

21   response was, well, after it's done, then let's sit down,

22   let's meet with the court again and then let's have a

23   discussion about this.  This is just part of what we're

24   getting at every turn here.

25             It's like file an IPR against us, move for a stay.

1  File a second IPR against you, file a motion for
2  reconsideration of that decision, you know.  Let's fight
3  tooth and nail on every single claim.  Let's delay.  I'm
4  tired of getting blazed in this case.  It's 18 months.  I
5  want to get somewhere.

6         Five months from now, we're going to be in the same
7  exact position having to do the same exact thing.  You know,
8  discovery disputes, there shouldn't be discovery disputes.
9  Whatever is relevant to this product should be produced
10 relevant to the case -- to the issues.  I can tell you that
11 none of these discovery requests are going to say, you know,
12 a particular limitation of one of these claims.  It's going
13 to say about enterprise guide, about the accused product, how
14 does it operate.  None of these are going to be specific
15 enough to distinguish between one claim and a second one.
16 It's -- it just doesn't make sense to me that, okay, the only
17 reason it's delaying five months, that's the only reason that
18 I can really see not to move forward and I have yet to
19 hear -- I mean, you know, I've heard generalities again.

20         Specifically, what are they not going to want to
21 produce or not produce in this case would the claim survive
22 or not.  That's what I want to know and I still didn't hear.

23         THE COURT:  Well, generalities are not as
24 insignificant to me as they are to you because I am -- one
25 thing that is clear is that there will be more definition

1    five months from now than we have now as to what has ensued

2    and what's not.

3          Now, I mean, whether that's going to be such --

4    there's going to be -- it's going to be certain and right now

5    it's uncertain, okay.  I mean, I could, though I'm not sure

6    that it is -- that it makes a whole lot of sense, and I'm

7    probably spending more time on this than you even thought I

8    would entertain on this or most judges in this building would

9    entertain on it but I was in your shoes before and I always

10   try to make sure that I move cases along as efficiently as I

11   can.  But God's honest truth is -- I mean, you didn't serve

12   any -- Mr. Marlott, you didn't serve written responses to

13   their discovery requests?

14         MR. MARLOTT:  We did serve written responses, your

15   Honor.

16         THE COURT:  Okay.  So did you --

17         MR. MARLOTT:  They didn't produce any documents in

18   response to those requests because we requested a stay --

19         THE COURT:  Did you object to a whole bunch of stuff

20   or did you just object because -- I can't remember.  I looked

21   at it at the time.  Did you object to particular requests as

22   being irrelevant, unduly burdensome, not likely to lead to --

23   reasonably calculated to lead to the discovery of admissible

24   evidence or did you just say we're objecting because we're

25   moving for a stay?

1          UNIDENTIFIED MALE SPEAKER:  No, your Honor.  We had

2     general objections and specific objections.

3          THE COURT:  Yeah.  And if I were -- if I were to

4     say, you know, I want to hear from SAS with respect to

5     particular requests here why, A, you know, litigate the -- if

6     I were to -- if I were to say let's go forward with some

7     discovery, SAS, tell me which of these requests for

8     information are going to be unnecessary or different

9     depending upon the IPR process -- totally theoretical,

10    totally a theoretical question.  You don't have them in front

11    of you.  You don't know what you're going to do.

12          UNIDENTIFIED MALE SPEAKER:  Yeah.

13          THE COURT:  I mean, my strong suspicion is we're

14    going to get involved in a wrestling match, Mr. Hanft.  I

15    mean, from your perspective, from the plaintiff's

16    perspective, your discovery is reasonably calculated to lead

17    to the discovery of admissible evidence.  It's -- none of it

18    is burdensome.  All of it is relevant.  All of it will be

19    relevant whatever happens in the IPR process.  The other side

20    shouldn't reasonably be able to object to anything.  They

21    shouldn't be able to say, Judge, I shouldn't have to go

22    through this production unless and until I have a better

23    sense of the -- what their resolution is in the IPR process.

24    They shouldn't be able to say any of that.  They shouldn't be

25    able to say I don't want to have to go back to my people

1 twice depending upon what these amended claims might be that

2 I haven't seen yet because if they say that, I'm going to say

3 you know what they are and they're going to say I don't know

4 what they are.  And then I, as an unsophisticated and

5 unschooled in even technology let alone where you are deep in

6 the trenches on this, I'm going to have to figure that out.

7 And my -- I mean, I'm not dismissing what you're

8 saying.  You may be a hundred percent right but it still

9 doesn't make sense to me.  I mean, it still doesn't make

10 sense to me.  What makes sense to me is to figure -- is to

11 get better definition out of this IPR process.

12 You know, I read in the briefs or I went back and I

13 looked and neither of you are competitors so you're not out

14 there beating each other up.  This is a -- you know, there's

15 a legitimate case here.  There's a question of damages, all

16 the rest.  I -- my gut is -- and maybe it will be disproved.

17 My gut is I'm going to know a lot more after the IPR process

18 and I'm going to actually save you money, I'm going to

19 actually save your client money because if these guys

20 are so -- if SAS is so intent on delay, delay, delay, delay,

21 then if I were to say we're going forward with discovery,

22 that's what they're going to do.  They're going to throw down

23 road blocks.  They're going to say I need an extension of

24 time to do this and -- because they're looking at the clock

25 and they're trying to run out the clock.  They're like Coach

1    K at Duke, you know, we got these guys in the four corners

2    and they're going to run out the clock, if you're right.  I'm

3    not saying they're right, okay.

4              UNIDENTIFIED MALE SPEAKER:  Thank you, your Honor.

5              THE COURT:  I'm not saying they're right but I've

6    seen it happen.  All right.  I can't get it done -- you know,

7    we're getting into spring break here and my kids are on break

8    and I'm going to, you know, Taloume, I need an extra two

9    weeks, and then I need another two weeks and then, you know,

10   you start doing a slow burn and then you move to compel and

11   then, you know, they come in and they say, Judge, what do you

12   want me to do, I'm trying to do this, my client is in

13   Ethiopia and I haven't been able to and so we come back.

14        So if they want to delay it, we're going to screw

15   around with this and I can eliminate a whole lot of that.

16   I'm not saying you're wrong, all right, and I'm not saying

17   your client is wrong here.  I'm not.  I'm not sophisticated

18   enough to know.  And it may be at the end of the day the

19   patent is deemed to be valid, most of the claims survive,

20   we're back here and they would have had to produce the same

21   exact amount of documents, okay.  And they -- but I have a

22   feeling that rather than getting involved in that whole arm

23   wrestle, I am better off.  The parties are going to save a

24   little bit of money if we just wait a little bit.

25        If this was the case that was in front of Sharon

1    Coleman where, you know -- and I understand delay costs money

2    but, you know, in the end we're talking about damages.  And

3    so if this was the issue of whether same-sex couples should

4    be allowed to marry before June or after when the law goes

5    into effect in Illinois, that's different, okay.

6            But my gut tells me that -- I understand -- I think

7    I understand the argument you're making.  It's a valid

8    argument.  It's a good argument.  But when I put all this to

9    the mix, I say I'd still like to see what happens as a result

10   of this process.  I can tell you that, you know, you're in

11   front me and I'm not a delay kind of guy.  I'm not.  So I

12   understand it's been pending a long time but I tend to get

13   things -- you know, despite -- I moved you guys because I

14   think I had a criminal matter that I had to do but I didn't

15   move you six months, you know, and I didn't wait to issue a

16   written opinion on this for -- you know, that would take my

17   law clerk three months to -- or, you know, a month to draft

18   and then me I'd be carrying it in my briefcase on the train

19   and you wouldn't get it so I do try and react quickly.  I

20   don't usually write on discovery issues very much so I try

21   and get them.  I use Rule 16.  I try and move cases so, you

22   know, but I'm going to -- I'm going to deny the motion to

23   lift the stay for these reasons.

24           It's not a frivolous motion or a wrong motion.  I

25   get it.  But on balance, I think I'm not convinced that we

1   would be saving so much time or making so much progress if we

2   didn't.  And I definitely understand you're saying I'm

3   getting generalities.  I'm getting generalities too but I'm

4   trying to read between the generalities.  That's my ruling.

5            UNIDENTIFIED MALE SPEAKER:  Thank you.

6            UNIDENTIFIED MALE SPEAKER:  I really appreciate you

7   hearing us and taking the time.  It means a lot to us.

8            THE COURT:  Okay.  Well, thanks for coming in

9   because, you know, it's obviously better.  I mean, there's

10  always a balance between whether you should appear by phone

11  or not.  I hated appearing by phone.

12           UNIDENTIFIED MALE SPEAKER:  Yeah.  If I can address

13  that.  One of the main reasons is because I did that last

14  time and it's --

15           THE COURT:  It was ineffective.

16           UNIDENTIFIED MALE SPEAKER:  It's ineffective, one,

17  because you're not -- you can't see facial expresses and

18  things.  And the second is, everybody keeps moving away from

19  the microphone.

20           THE COURT:  And then you can't hear, yeah.

21           UNIDENTIFIED MALE SPEAKER:  And it became incredibly

22  difficult to do --

23           THE COURT:  I'm sorry.

24           UNIDENTIFIED MALE SPEAKER:  -- but -- you know.  If

25  both parties appear by telephone, it works because then

1    it's --

2           THE COURT:  Yeah.

3           UNIDENTIFIED MALE SPEAKER:  -- a level playing

4    field.

5           THE COURT:  I agree.  And I shouldn't say it was

6    ineffective last time and I read the transcript.  You came

7    through fine.  I think I understood what you were saying the

8    last time.

9           UNIDENTIFIED MALE SPEAKER:  We had trouble

10   hearing.

11          THE COURT:  Okay.  Well, to the extent -- for

12   routine matters, I would hate to have you burning up the --

13   but it's closer for you than you because it's an easier

14   flight in from New York than it is from -- where are you, San

15   Francisco, Mr. Yu?

16          MR. YU:  Yes, your Honor.

17          MR. HANFT:  Yeah.  He's --

18          THE COURT:  Okay.  So -- but I -- I am always happy

19   to have people appear by phone if they want and I'm also

20   always happy to have them appear in person.  I do agree that

21   in-person appearances are much more effective and better than

22   phone conversations.  But if we're just doing a scheduling

23   thing, then I think you could appear by phone.

24          I used to -- you know, when we got the Blackberries,

25   sometimes I used to appear by phone and my local counsel used

1  to appear in person and I used to get these, you know, and

2  then I used to get an e-mail from the guy but it's hard

3  because some judges don't want you doing it.  But I remember

4  getting one e-mail when I was appearing by phone which was

5  stop, it's not working.  So whatever facial expression the

6  judge was giving, I wasn't seeing it and he was PO'd at me

7  and I wasn't helping my cause.  You know, I'm looking at my

8  screen, you know, I'm trying to make my point and he says

9  stop.  I think I'm going to stop, your Honor.  But, Mr. Yu,

10 you were perfect.

11        MR. YU:  I can keep quiet when I'm told, your

12 Honor.

13        THE COURT:  Okay.  All right.  Let me know what

14 happens.  If this again falls off the end of the cliff there,

15 you know, you want to bring this to my attention, bring

16 something to my attention.  If I'm going to look at this

17 again ever and I'm not being -- I'm going to get very

18 specific.  I don't want to get general.

19        UNIDENTIFIED MALE SPEAKER:  Okay.  Thank you, your

20 Honor.

21        UNIDENTIFIED MALE SPEAKER:  Thank you, your Honor.

22        MR. YU:  Thank you, your Honor.

23        THE COURT:  Yep.  Bye.  Have a nice weekend.  Have a

24 nice trip back.

25     (Which concluded the proceedings in the above-entitled

1  matter.)

2                      C E R T I F I C A T E

3        I hereby certify that the foregoing is a

4  transcription of proceedings transcribed from digital

5  proceedings held before the Honorable Jeffrey T. Gilbert on

6  March 7, 2014.

7

8  */s/Laura LaCien*

9  _____        March 24, 2014
   Laura LaCien                               Date
10 Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25